# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SUSAN H. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-00310 |
| | ) | Judge Aleta A. Trauger |
| DENIS R. McDONOUGH, Secretary, | ) | |
| Department of Veterans Affairs,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the court is defendant Denis R. McDonough's Motion for Summary Judgment (Doc. No. 33), seeking judgment in his favor on the plaintiff's claims under the Rehabilitation Act. For the reasons set forth herein, the motion will be granted.

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

---

[1] Denis R. McDonough became the Secretary of the Department of Veterans Affairs on February 9, 2021 and, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, is substituted for Robert Wilkie as the defendant in this case.

In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). A fact is "material" within the meaning of Rule 56(a) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

In this case, the plaintiff purports to "dispute" many of the facts set forth in the defendant's Statement of Undisputed Facts (Doc. No. 36) by asserting that the "cited documents are unsworn and uncertified. The Court is not permitted to consider such documents on summary judgment." (Doc. No. 40 ¶¶ 16–20, 30, 32, 33, 35–44, 54, 81 (citations omitted).) The plaintiff is mistaken. Since December 1, 2010, Rule 56 has made it clear that a court is not limited to consideration only of sworn and certified documents in ruling on a motion for summary judgment. Instead, a party may support assertions of fact by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A party may object to reliance upon cited material to support a fact on the basis that it "*cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). Consequently, with respect to the individual

statements to which the plaintiff has responded only by asserting that the supporting material is not *currently* in admissible form, if the statements are adequately supported by the material cited by the defendant and *could be* presented in admissible form, the court deems them to be undisputed for purposes of his motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The facts set forth herein are undisputed for purposes of the defendant's motion, unless otherwise indicated.

Jones worked as a Financial Accounts Technician, grade GS-503-07, with the Department of Veterans Affairs Mid-South Consolidated Patient Account Center ("CPAC") in Smyrna, Tennessee from April 1998 until her retirement on December 31, 2014. She worked for the Department of Veterans Affairs ("Agency") in some capacity for twenty-five years.

Jones's direct supervisor for a period of several years preceding June 2014 was Tim Nave. (Nave Dep., Doc. No. 42-1, at 8.) In June 2014, Nave was promoted, and his supervisory position remained vacant for approximately two months before being filled by Teal Hatfield, who then became the plaintiff's direct supervisor. (Hatfield Dep., Doc. No. 42-2, at 11.) Nave was then Hatfield's manager. Greg Becker was the director of the Mid-South CPAC during the relevant period, and Cindy DeGrasse was the Chief Operating Officer.

Jones understood that her employment required a monthly productivity level of at least 90%, and she had difficulty meeting this level for several years prior to her departure from the Agency. Nave, her supervisor, discussed this with her several times, beginning in 2011 and again in the fall of 2013. (*See* Doc. No. 34-4, at 3–4, 33–39.). In November 2013, Nave notified Jones that her productivity level for October was 50%, "well below the 90% Fully Successful range as stated on [her] Performance Appraisal." (*Id.* at 34.) He reminded her that they had discussed that her productivity had been "up/down" throughout the preceding fiscal year and recommended that

she utilize the "Huron Work Flow Tool" to better organize her time. (*Id.*) He also informed Jones that she would have a month to improve her productivity level to "at least the Fully Successful range" and that failure to do so would necessitate taking the matter to the "next level," likely requiring a performance improvement plan ("PIP"). (*Id.*)

In a follow-up email dated December 18, 2013, Nave notified Jones that her productivity scores for October, November, and the first two weeks of December averaged, respectively, 46%, 81%, and 74%, for an overall average of 67%, and she had failed to explain why her performance had "plummeted so far" below her average for fiscal year 2013. (Doc. No. 34-4, at 33.) Because she had indicated to him that additional training might help, he had set aside a morning to provide one-on-one training to her on the Huron Work Flow Tool, but he also believed the next step would likely be to put her on a PIP. (*Id.* at 34.)

As of January 9, 2014, due to Jones's continued failure to maintain a satisfactory level of productivity, which the Agency considered a "critical element" of her job performance, she was placed on a PIP. (Doc. No. 34-1, at 45.) The Memorandum from Nave to Jones formally notifying her of the initiation of the PIP informed her that she had a ninety-day period during which to improve her performance to an acceptable level and that she would be expected to maintain successful performance for an additional nine months, or a full year from the start of the PIP. The Memorandum also stated that failure to "demonstrate acceptable performance during this opportunity period [the ninety-day PIP] or . . . to sustain it for a one-year period" could result in demotion or termination. (*Id.*) In addition, the Memorandum "reminded" Jones that an Employee Assistance Program ("EAP") was available to assist her as needed and provided the telephone number for contacting the EAP. (*Id.* at 46.)

During the ninety days during which the PIP was in effect, Nave met with plaintiff weekly to provide additional one-one-one training, discuss her work, provide feedback, and offer assistance in how to organize, prioritize tasks, and use her time more wisely. Between January 9 and April 9, 2014, Jones increased her productivity to acceptable levels. She successfully completed the ninety-day PIP, bringing her productivity scores up to the desired level during that time frame. (*See* Doc. No. 34-1, at 47; Doc. No. 34-4, at 20–21.)

Immediately after the PIP terminated, however, the plaintiff's productivity levels once again dipped below the acceptable level. On April 29, 2014, Nave advised her that her performance score had fallen to well below 90% for each of the two weeks preceding that date, bringing her average for April to 84.5%. (*See* Doc. No. 34-4, at 25–26 (email from Nave to Jones notifying her that her productivity was at 94% and 95% for the first two weeks of April—while the PIP was in place—and 83% and 66% for the two weeks after expiration of the PIP).)

On May 6, 2014, as a result of the plaintiff's failure to maintain her productivity after the expiration of the PIP, COO DeGrasse proposed the termination of Jones's employment, noting, "We don't have a different position to accommodate lack of productivity." (Doc. No. 34-4, at 23–24.) Nave advised Thomas Kareem, the division's CBO, of the recommendation to terminate Jones, but he also advised that he would "defer" to Kareem's "guidance and recommendation." (Doc. No. 34-4, at 28.) On May 7, 2014, Kareem's office requested the productivity reports documenting Jones's "less than fully successful performance" in the area of productivity since completing the PIP. (Doc. No. 34-4, at 27.) Nave provided the requested information (*id.* at 32), but apparently there was no follow up and no move to immediately terminate the plaintiff at that time.

On June 26, 2014, Nave notified Jones that her productivity score for the week of June 9, 2014 was 72% and advised her again that she needed to improve. (Doc. No. 34-4, at 59.) From May through September 2014, her productivity average was 75%. (Doc. No. 34-4, at 62.) Following Nave's June 26 email, however, there was a delay in the Agency's providing productivity scores to the plaintiff, due to the approximately two months between Nave's promotion and Teal Hatfield's appointment to replace him. On September 11, 12, and 15, 2014, Hatfield sent the plaintiff a series of emails informing her of her productivity numbers for the weeks of June 30 through the end of August 2014, showing a range of productivity during that time frame of 54% to 84%. (Doc. No. 34-1, at 31–44.)[2] The hours that the plaintiff was on leave were not counted in the calculation of her productivity score. (DeGrasse Dep., Doc. No. 42-3, at 14 ("So when [an employee is] absent, obviously we don't count those hours into the productivity calculation.").)[3]

The plaintiff's mother died on September 2, 2014, and her father died on September 10, 2014. For months preceding their deaths, the plaintiff's parents were in failing health, and the primary responsibility for their care fell upon the plaintiff. (Jones Decl., Doc. No. 41 ¶¶ 6, 8.) The plaintiff took significant leave related to the care of her parents and other issues during this period of time. (*Id.* ¶ 10.)

---

[2] Nave and Hatfield both testified that it was possible for an employee to calculate her own productivity score. (Nave Dep., Doc. No. 42-1, at 18, 36; Hatfield Dep., Doc. No. 42-2, at 13.) The plaintiff disputes this, pointing to the testimony of one of her former colleagues, who stated that there was "no way" employees could "pull [their] own productivity." (Morris Dep., Doc. No. 42-7, at 15.) The court does not find this dispute to be material.

[3] The plaintiff attempts to call this fact into dispute, but her reference to Nave's testimony does not support her position, because there is no indication that Nave was talking about consideration of leave time as opposed to the plaintiff's lack of productivity while she was actually at work during the month of September. (*See* Nave Dep., Doc. No. 42-1, at 33.) In addition, the emails sent to the plaintiff containing her productivity numbers show that productivity was calculated based on the number of hours actually worked. (*See, e.g.*, Doc. No. 34-2, at 14–17.)

On October 1, 2014, Hatfield sent Jones an email regarding her continued failure to meet the standards required by her performance plan. She advised the plaintiff that her overall productivity average for the year was at a failing status of 81% and that her average from May through September was 75%. In her email, Hatfield noted that she was "reaching out to see if there may still be some issue(s) or reason(s) for not being fully successful." (Doc. No. 34-2, at 23.) Hatfield and Jones met that day to discuss the matter. The plaintiff told Hatfield then that she was going through a "life altering crisis," having lost both of her parents in September, and that she had some "ongoing health issues of her own." (Doc. No. 34-2, at 24.) Hatfield advised her, in the meeting and in the email documenting the meeting, that the EAP was available to the plaintiff "if she feels the need for counseling, or other services." (*Id.*) Hatfield asked Jones for a written "reply/justification" for her failure to meet productivity standards, and the plaintiff requested a few days to "put her thoughts together." (*Id.*)

The plaintiff provided the response requested by Hatfield in an email to Hatfield and Nave, and copied to her union representative, dated October 6, 2014. (Doc. No. 41-2, at 3.) In this email, the plaintiff stated that taking care of her parents' "physical, emotional, and spiritual well-being" while their health declined had begun taking up a substantial amount of her time beginning in January 2014 up until both of their deaths within a week of each other. She described the "stress and anxiety" and "loss of sleep and hence fatigue" she had been experiencing in connection with their care and their deaths as possibly "developing into a crisis." (*Id.*) She stated that she believed that her "work performance has been deteriorating due to the major life change [she had] experienced" and requested a "supportive work environment" and "the time necessary to work through this crisis phase." (*Id.*) She mentioned that, on top of everything else she had been going through, she had just learned that she "may have to have surgery." (*Id.*)

She concluded the email by requesting that "all of this" be considered in Nave's and Hatfield's "evaluation of [her] performance." (*Id.*) She also requested that she be "allow[ed] . . . to pursue all resources" available to her "in order to recover from this major life event" and that she be "given respect and dignity during this difficult time in [her] life." (*Id.*) She alluded to the possibility that she might need "several weeks of sick leave" if her situation was not addressed and also requested the opportunity to seek help through the EAP. (*Id.*) And she mentioned that she had an appointment to see her primary care doctor later that day. (*Id.*)

The plaintiff claims that, after this meeting, she informed Hatfield that she had seen her doctor, had been placed on Zoloft, and had received a letter from her doctor, who "thought [she] should be more like [herself] over the next few weeks." (Jones Decl., Doc. No. 41 ¶ 15.) She also claims that her productivity went up immediately after that doctor's visit. Attached to her Declaration are copies of emails from Hatfield showing that Jones's productivity scores were above 100% for the weeks of October 20, October 27, November 3, and November 10, 2014.[4] (Doc. No. 41-4.) Hatfield testified that she never saw the plaintiff's doctor's note until it was shown to her during her deposition. (Hatfield Dep., Doc. No. 42-2, at 28.)[5]

On October 29, 2014, the plaintiff received a Memorandum from DeGrasse's office with the subject line "Proposed Removal – Unacceptable Performance" (hereafter "Proposed Removal

---

[4] The productivity rating for the week of October 13, 2014 is not visible on the plaintiff's scanned exhibit. The rating for the week of October 27 is only partially visible, but it appears to be 124%.

[5] Hatfield also testified that the plaintiff never provided any specifics about her treatment other than what was contained in the October 6 email or disclosed that she was on medication. (Hatfield Dep., Doc. No. 42-2, at 18–19, 29.) For purposes of the defendant's motion, the court accepts as true the plaintiff's statement that she told Hatfield that she had been prescribed Zoloft and that her doctor thought she would be better within a few weeks.

notice"). (Doc. No. 34-6, at 14–15.) The notice outlined the terms of the PIP, the plaintiff's successful performance during the ninety-day PIP period, the requirement that she sustain that level of performance during the nine months following completion of the PIP, and her failure to maintain satisfactory performance from June through September 2014. (*Id.* at 14.) The notice identified its purpose as notifying the plaintiff, in accordance with 5 U.S.C. Ch. 43, of the proposal that her employment be terminated for failure to "meet the performance standards of the critical element of [her] position entitled Productivity." (*Id.*) It set forth the productivity standard and the plaintiff's actual performance numbers for June through September.[6]

The plaintiff was given fourteen days to reply to the notice and notified of her right to be represented by an attorney or other representative at all stages of the proceedings. The Proposed Removal notice also stated that the "final decision to effect the action proposed [had] not been made" yet and that Gregg Becker would make the final decision. (*Id.* at 15.)

The plaintiff, through present counsel, provided a written reply to Becker dated November 4, 2014. (Doc. No. 34-1, at 28–30.) The letter described the crises Jones had endured in 2014, culminating in the death of both of her parents in early September. It stated that she had visited her

---

[6] The plaintiff states that it would have been important for "workforce management, who was consulted in the decision to propose Plaintiff's termination, to know that Plaintiff had not been provided her productivity statistics" for July and August until mid-September. (*See* Nave Dep., Doc. No. 42-1, at 37.) It is unclear whether that information was shared with "workforce management." (*Id.* at 36–37.) However, there is no evidence in the record regarding to what extent "workforce management" had input in the decision to issue the Proposal Removal notice. DeGrasse also agreed that it was "important that employees know where they stand and what their productivity is." (DeGrasse Dep., Doc. No. 42-3, at 18.) DeGrasse was apparently not aware that there was a period of time, after Nave was promoted and before Hatfield was promoted to his vacated position, during which productivity statistics were not being provided to employees, and she agreed that this would have been an important factor for her to know. (*Id.*) Regardless, she did not indicate during her deposition testimony that knowing this would have altered her decision to send the Proposed Removal notice. She testified instead that the plaintiff's removal could have been effected immediately after the ninety-day PIP terminated, when the plaintiff's productivity levels again fell below 90%. (*Id.* at 33.)

primary care physician on October 6, 2014 "to address her anxiety and depression, which resulted in sleep loss and fatigue." (*Id.* at 29.) It characterized the plaintiff's October 6 email to Hatfield as explaining that she was experiencing a "crisis" and "suffering from the disabilities of anxiety, insomnia, and nervous collapse." (*Id.*) According to the attorney, the plaintiff's primary care physician had "noted" Jones's "difficulty concentrating, resulting in decreased productivity" and prescribed Zoloft, which the physician believed would help her "improve a great deal in the next few weeks." (*Id.*) The attorney also stated that Jones had reported back to Hatfield that her doctor had prescribed Zoloft and that her doctor believed that she "should be more like herself over the next few weeks." (*Id.*) He also stated that, after going on Zoloft, the plaintiff's productivity increased dramatically. (*Id.*)

The attorney's letter describes the plaintiff as suffering from "disabilities," at least as of the date of her doctor's visit on October 6. However, it also characterizes Jones's poor performance as a past event, one for which she had taken proactive measures to "bring herself back to a successful level by seeking medical help, which has shown to be of great help and effect." (*Id.*) The doctor's note, which was attached as an exhibit to the attorney's letter, states in full:

> [Patient] just recently lost both of her parents. So she told me today that she has been having some difficulty concentrating and her productivity has been going down[.] My feeling is given time, with new medication [patient is] given she will improve a great deal in the next few weeks[.] Any questions please call, she is under my care.

(Doc. No. 34-7.) Finally, the attorney's letter indicated that he and Jones looked forward to meeting with Becker or his designee to provide Jones's oral reply to the Proposed Removal notice. (Doc. No. 34-1, at 30.)

Gregg Becker did not know and had never met Jones prior to the circumstances giving rise to her proposed termination. He met with her and her counsel on November 26, 2014. Becker testified that, prior to that meeting, he was "briefed" on the situation and "reviewed some of the

information [behind the] proposed disciplinary action." (Becker Dep. at 13, Doc. No. 34-8, at 8.) He recalled that the "workforce management person briefed [him]" and that he spoke with DeGrasse "just to verify the trend of nonperformance," but his focus was on meeting with the plaintiff and finding out what was going on from her perspective. (*Id.* at 14–15, Doc. No. 34-8, at 9–10.)

Regarding the actual meeting with the plaintiff and her counsel, Becker recalled that it was a "very brief positive meeting" during which Jones did "most of the talking." (Becker Dep. at 18, Doc. No. 34-8, at 11.) She effectively conveyed that she wanted to "come back and work hard" and believed that "she was in a position at that point to perform at a high level." (*Id.* at 19, Doc. No. 34-8, at 12.) Becker's recollection was that whatever issues the plaintiff had been dealing with over the past year "had all been processed through." (*Id.*)

Becker recalled that he had responded to the plaintiff's statement that she "want[ed] to be a part of Mid-South CPAC" by telling her that he wanted her to be part of Mid-South CPAC as well and that, to make that happen, they would do a "last chance agreement." (*Id.* at 20, Doc. No. 34-8, at 13.) He recalled that the plaintiff "felt very confident . . . that she could perform at that level." (*Id.*) After the meeting, he contacted the workforce management representative and informed that person[7] that they would proceed with a last chance agreement. (*Id.*)

The plaintiff agrees that the meeting with Becker was generally positive but denies discussing a last chance agreement during that meeting. (Jones Decl., Doc. No. 41 ¶ 23.) According to Jones, she explained all of her circumstances to Becker, including that her productivity had "increased greatly" after she had received medical treatment and that she "needed some time to continue my improvement while under medical treatment." (*Id.* ¶ 22.) She felt good after meeting

---

[7] Becker did not recall who the workforce management representative was.

with Becker and was apparently surprised when she received the proposed Last Chance Agreement ("LCA") on December 12, 2014. (*Id.* ¶¶ 23, 24.)

According to the terms of the LCA, Becker found that there was "enough evidence to support the proposed removal for performance and that removal was the appropriate penalty." (Doc. No. 34-6, at 16.) As an alternative to termination, however, Becker had "chosen to hold his formal decision in abeyance" in exchange for Jones's agreement to enter into the LCA. (*Id.*) Entering into the LCA would have allowed Jones to retain her position, but it also would have required that she abide by its terms for two years, specifically by maintaining her productivity scores and other performance measures at an acceptable level and not engaging in any misconduct. The LCA provided that the plaintiff could be terminated without prior notice if she failed to comply even once with the terms of the LCA during that two-year period and that she waived her right to challenge removal during the term of the LCA if she failed to comply with its terms. According to the defendant, the LCA contained standard language that had been used in prior LCAs.

The plaintiff did not agree to or sign the LCA. Finding it "overbearing" (Jones Decl., Doc. No. 41 ¶ 25), she instead sent Hatfield an email on December 19, 2014 with the subject line "Retirement Requested," in which she stated: "I have verified my eligibility for retirement, I have reached all requirements. I have turned in my retirement paperwork to become effective 12/31/2014" (Doc. No. 34-1, at 67). The plaintiff's Notification of Personnel Action indicates that her "Retirement–Voluntary" was effective December 31, 2014 and that the reason for retirement was to "obtain retirement benefits." (Doc. No. 34-1, at 54.) The plaintiff had learned from discussions with her union representative that she risked the loss of her retirement benefits if she was terminated involuntarily. (Jones Decl., Doc. No. 41 ¶ 26.)

The plaintiff states that, because the "circumstances" of her "2014 crises" had "fallen on deaf ears" and because no one credited her for having shown immediate improvement after seeking "mental health help," she did not trust that the same supervisors involved in the decision to issue the Proposal Removal notice and the LCA would not "find some reason" to terminate her if she accepted the LCA. (Jones Decl., Doc. No. 41 ¶ 27.) She believed the only reasonable course at that point was to retire rather than to accept the terms of the LCA. (*Id.* ¶ 28.)

There is no dispute that, as a long-term employee of the federal government, the plaintiff had numerous leave options available to her, including up to 104 hours (thirteen days) of sick leave annually for family care and bereavement, as well as substantial annual leave, advanced annual or sick leave, leave without pay, alternative work schedules, leave under the Family and Medical Leave Act, and leave under the leave transfer or leave bank program. Jones requested and was granted multiple leave days during the months of June through September 2014, prior to the Agency's decision to address her continued failure to meet productivity expectations. Every leave request submitted by the plaintiff during that time frame was approved, whether for family care or for personal vacation time. DeGrasse testified that it is "not a given" that an employee's requests for leave will be "automatically approve[d]," but in the plaintiff's case, "[s]he was never told that she couldn't . . . call in and request as much leave as she needed." (DeGrasse Dep., Doc. No. 42-3, at 35.) There is no suggestion in the record that the plaintiff had exhausted the leave available to her for the year by the time Jones met with Becker. However, after receiving the proposed LCA, the plaintiff did not request any additional leave, in any form. Instead, she simply notified Hatfield of her decision to retire.

Following her retirement at the end of December 2014, the plaintiff filed a formal administrative complaint of discrimination on March 13, 2015. (*See* Doc. No. 34-1, at 4.) This

complaint, administrative complaint number 200H-0731-2015101531, is the underlying basis for Jones's Complaint initiating this action. (Doc. No. 1.)

On December 30, 2020, then defendant Wilkie filed his Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Facts, and, as suggested above, numerous evidentiary exhibits. (Doc. Nos. 33–36.) The plaintiff filed a Response, Response to the Statement of Undisputed Facts, a Statement of Additional Facts, and her own evidentiary materials. (Doc. Nos. 39–42.) The defendant filed a Reply, Response to the Statement of Additional Facts, and additional supporting documents. (Doc. Nos. 43, 44.)

## III. DISCUSSION

Jones's Complaint asserts a single "count" or cause of action, based on the defendant's alleged violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794, but she appears to state two, or perhaps three, distinct causes of action under the Rehabilitation Act. The first is premised upon the defendant's purported failure or refusal to allow the plaintiff a "reasonable accommodation" that would have permitted her to continue working while addressing an alleged disability; the second is for retaliating against the plaintiff for exercising her rights under the Rehabilitation Act. (*See* Doc. No. 1 ¶¶ 41.) The plaintiff also claims that she was constructively discharged when she resigned rather than accepting the LCA. The defendant seeks dismissal of all claims in their entirety.

### A. Failure to Accommodate

#### 1. *Legal Standards*

The Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, provides the exclusive remedy for employees of the federal government asserting disability discrimination claims. *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). "Apart from [the Rehabilitation Act's] limitation to denials of benefits 'solely' by reason of disability and its [application only to] federally funded—as opposed

to 'public'—entities, the reach and requirements" of the Americans with Disabilities Act ("ADA")
and the Rehabilitation Act are the same. *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008)
(quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)). Thus, claims brought
under the Rehabilitation Act and ADA are generally reviewed under the same standards. *Shaikh v.
Lincoln Mem. Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) (citing *Jakubowski v. Christ Hosp.,
Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)).

A plaintiff can establish a claim of disability discrimination through either direct or indirect
evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). Courts are to
evaluate disability discrimination cases relying on indirect evidence by using the familiar burden-
shifting framework from *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), as refined by *Texas
Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Jones*, 488 F.3d at 403–04.
Under this framework, the plaintiff must first articulate a *prima facie* case of discrimination. If she
clears that hurdle, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory
reason for the challenged employment decision. Should the employer carry this burden, then the
burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's
proffered reason was in fact a pretext designed to mask illegal discrimination." *Id.* at 404 (citing
*Burdine*, 450 U.S. at 253). The plaintiff can defeat summary judgment "only if [her] evidence is
sufficient to 'create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Id.*

If a plaintiff has direct evidence of discrimination, the *McDonnell Douglas* framework does
not apply. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). "Direct evidence is
evidence that proves the existence of a fact without requiring any inferences." *Grizzell v. City of
Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (internal quotation marks and citation
omitted). "The direct evidence standard essentially requires an admission in some form by the

employer that it relied on the disability in making an employment decision." *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002) (citation omitted).

The Sixth Circuit has recently clarified that, at least in the context of the ADA, as opposed to the Rehabilitation Act, failure to accommodate claims are considered to involve direct evidence and so are not analyzed using the *McDonell Douglas* framework. *Fisher*, 951 F.3d at 416. However, the understanding that failure to accommodate claims necessarily rely on direct evidence apparently has not been carried over to the Rehabilitation Act context. *See id.* ("As Nissan points out, we have occasionally . . . analyzed a failure-to-accommodate claim under the indirect test. These cases . . . each can be traced back to a single case, *DiCarlo v. Potter*, that applied the indirect test when analyzing a failure to accommodate claim under the Rehabilitation Act, not the ADA. Our court . . . has explained that though the two statutes have many similarities, they are not identical." (internal citations omitted)).

Thus, for purposes of a Rehabilitation Act claim, it appears that a plaintiff may still use the indirect-evidence framework to prove a claim for failure to accommodate. Under this standard, to establish a *prima facie* case of disability discrimination based on a failure to accommodate, the plaintiff must show that (1) she has a disability; (2) she is "otherwise qualified" for the position; (3) the employer knew or had reason to know of plaintiff's disability; (4) an accommodation was needed, that is, a causal relationship existed between the plaintiff's disability and the request for accommodation; and (5) the agency did not provide the necessary accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (citing *Gaines v. Runyon*, 107 F.3d 1171, 1175–76 (6th Cir. 1997)), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

And, whichever standard applies, [o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421, (6th Cir. 2020) (internal quotation marks and citation omitted). As the Sixth Circuit has explained,

> [f]rom that point, both parties have a duty to participate in good faith. . . . If the interactive process was triggered but not successfully resolved, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, though an employer is not required to propose counter accommodations, such a proposal may be evidence of good faith. On the other hand, an employer who determine[s] what accommodation it [is] willing to offer before ever speaking with the employee does not participate in good faith.

*Id.* (internal quotation marks and citations omitted).

Both parties in this case presume that the *McDonnell Douglas* framework applies to the plaintiff's failure to accommodate claim. (*See* Doc. No. 34, at 12; Doc. No. 39, at 8.) The court agrees, while remaining mindful that the "ultimate factual issue in the case" is "whether the defendant intentionally discriminated against the plaintiff." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Burdine*, 450 U.S. at 253).

### 2.    Analysis

The defendant argues that the plaintiff cannot establish a *prima facie* case for failure to accommodate and, more specifically, that she cannot show (1) that she was disabled; (2) that the Agency knew or had reason to know of any purported disability until her attorney sent his written response to the Proposed Removal notice to Becker on November 4, 2014; or (3) that Jones ever requested an accommodation or, therefore, that the defendant was obligated to provide an accommodation or engage in the interactive process for finding an appropriate accommodation. The defendant also argues that, even assuming the plaintiff could establish a *prima facie* case of disability discrimination, she cannot show that the defendant's proffered legitimate, non-discriminatory reasons for its actions are pretextual.

a)      *Whether the Plaintiff Is or Was "Disabled"*

The Rehabilitation Act, via the ADA, defines a "disability," in relevant part, as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); *see also* 29 U.S.C. § 705(20)(B) (adopting the definition of disability set forth in § 12102).[8] The term "mental impairment" is defined by the federal regulations as "[a]ny mental or psychological disorder, such as an intellectual disability . . . , organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

In 2008, the ADA was considerably altered by the passage of the Americans with Disabilities Act Amendments Act ("ADAAA"), in which Congress provided additional guidance to courts regarding the "disabled" requirement of the ADA. Specifically, courts have noted that, with the passage of the ADAAA, the "substantially limits" criterion of 42 U.S.C. § 12102(1), incorporated into the Rehabilitation Act via 29 U.S.C. § 705(20)(B), "is not meant to be a demanding standard." *See, e.g.*, *Taylor v. Specialty Rests. Corp.*, No. 2:12-cv-442014 WL 4922942, *4 (S.D. Ohio Sept. 30, 2014). Rather, the ADAAA provides:

> The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendment Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

---

[8] And individual with "a record of such [a mental or physical] impairment" or who is "regarded as having such an impairment" also satisfies the definition of disabled. The plaintiff here does not argue that either of these prongs of the definition applies to her.

29 C.F.R. § 1630.1(c)(4). *See also Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) ("The 'degree of functional limitation required for an impairment to constitute a disability' does not 'create a demanding standard.' The 'disability determination [thus is] an appropriate threshold issue but not an onerous burden for those seeking to prove discrimination under the ADA.'" (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)(1)(iv))).

Nonetheless, although the ADAAA loosened the standard for proving disability generally, it "left untouched the plaintiff's burden of proof; [s]he still has to prove [s]he has a disability." *Hale v. Johnson*, 245 F. Supp. 3d 979, 989 (E.D. Tenn. 2017) (quoting *Lloyd v. Hous. Auth.*, 857 F. Supp. 2d 1252, 1263–64 (M.D. Ala. 2012)); *see also Taylor*, 2014 WL 4922942, at * 5. "Courts are required to make a case by case determination of whether an individual qualifies as 'disabled.'" *Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)).

Consistent with the statutory definition, courts typically break the disability inquiry into three parts. *See, e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). In assessing whether a person has a "disability," a court must determine: "(1) whether the plaintiff has a physical or mental impairment; (2) whether that impairment impacts 'one or more major life activities'; and (3) whether the claimed disability imposes a 'substantial limit[ation]' on that identified major life activity." *Hentze v. CSX Transp., Inc.*, 477 F. Supp. 3d 644, 660 (S.D. Ohio 2020) (citing *Bragdon*, 524 U.S. at 631; 42 U.S.C. § 12102(1)).

The defendant here focuses on the question of whether the plaintiff has established, as a threshold matter, that she has a "physical or mental impairment." In particular, he points out that the plaintiff has not provided any medical documentation to support the existence of a recognized impairment. Although the defendant does not provide case support for his suggestion that medical

documentation is required to prove disability—and that is a debatable proposition under prevailing law—the court finds that, under the circumstances presented here, some documentation is required. The court, therefore, agrees that the plaintiff has failed to establish that she suffers from a mental (or other) impairment.

The only "medical" evidence of a "mental impairment" that the plaintiff has offered—and, indeed, the only medical evidence in the court's record—is Dr. Ahmad's note dated October 6, 2014. As quoted above, Dr. Ahmad's note identified only the functional limitations the plaintiff herself had described to him: Jones told him that she was having "difficulty concentrating and her productivity has been going down." (Doc. No. 34-7.) The physician noted that he had prescribed medication (without identifying what medication) and that he believed that the plaintiff's condition would improve a "great deal in the next few weeks." (*Id.*) Based on this language alone, the court cannot conclude that Dr. Ahmad diagnosed the plaintiff as suffering from any particular mental or psychiatric impairment. In addition, the plaintiff has not proffered any medical records from Dr. Ahmad or any other practitioner to support such a diagnosis.

Instead, the plaintiff apparently diagnosed herself as having depression and anxiety, and she does not indicate the onset date of these conditions or their duration. In the October 6, 2014 email to Nave and Hatfield, sent before the plaintiff ever saw her doctor, the plaintiff describes herself only as suffering from "stress and anxiety," which had led to "loss of sleep and hence fatigue." (Doc. No. 41-2, at 3.) In the Declaration prepared in response to the defendant's Motion for Summary Judgment, the plaintiff states that she visited her doctor on October 6 to "address [her] anxiety and depression, which resulted in sleep loss and fatigue." (Doc. No. 41 ¶ 11.) It is clear that anxiety and depression may qualify as "mental impairments." *See, e.g.*, *Williams v. AT & T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 823 (W.D. Tenn. 2016) ("It is undisputed that

Plaintiff suffered from the mental impairments of depressive disorder and anxiety as shown by medical evidence in the record . . . ."). The plaintiff's self-diagnosis of those conditions, however, is not sufficient to establish that she suffers from a mental or emotional illness. The plaintiff is certainly qualified to offer testimony regarding her symptoms and the degree to which her symptoms impaired her ability to function, but, to establish that she was disabled, she must first offer evidence from which a jury could find that she actually suffered from an "impairment."

Courts recognize that "[n]o language in the ADA or implementing regulations states that medical testimony is required," *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 643 (7th Cir. 2010), and "[t]here is certainly no general rule that medical testimony is always necessary to establish disability," *Katz v. City Metal Co.*, 87 F.3d 26, 32 (1st Cir. 1996). Rather, "[w]hether medical evidence is necessary to support a disability discrimination claim is a determination that must be made on a case-by-case basis." *Mancini v. City of Providence*, 909 F.3d 32, 39 (1st Cir. 2018). Courts generally require expert evidence when "a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition." *Id.* at 41 (citing *Felkins v. City of Lakewood*, 774 F.3d 647, 648, 652 (10th Cir. 2014)). In many cases finding that medical evidence is not required, it is undisputed that the plaintiff has been diagnosed with an impairment, and the question is simply whether medical testimony is required to establish the extent to which the impairment limits the performance of a major life activity. *See, e.g.*, *AutoZone*, 630 F.3d at 639 (noting that the defendant "acknowledged that [the plaintiff] suffered from an impairment" but disputed whether that impairment constituted a "disability" as defined by the ADA); *Katz*, 87 F.3d at 31 (noting that the defendant never disputed that the plaintiff had had a heart attack and therefore that a jury could easily find that the plaintiff had a physical impairment under the ADA, and moving on to consider whether medical evidence was required to establish to what extent the plaintiff's ability to perform

major life activities was limited by that impairment). In *Mancini*, the defendant disputed whether the plaintiff had established the existence of an impairment, but the court found that medical evidence was not required to establish that the plaintiff had a knee injury, where it was undisputed that he had been injured on the job and had required surgery to his knee and other medical care. Simply put, the court concluded that a knee injury, like a heart attack or chronic neck and arm pain, "plainly f[e]ll within the universe of impairments that a lay jury can fathom without expert guidance." 909 F.3d at 42.

In the context of mental health impairments and other impairments based upon a specific medical condition, however, courts have regularly held that a self-diagnosis is not sufficient to establish the existence of an impairment. Thus, for instance, in *Heit v. Aerotek, Inc.*, 726 F. App'x 648 (9th Cir. 2018), the Ninth Circuit affirmed summary judgment for the defendant, where the plaintiff failed to offer medical proof of his self-diagnosis of "shy bladder syndrome," a psychiatric condition characterized as a "social anxiety disorder," stating: "[L]ay witnesses [like the plaintiff, however, are] incompetent to testify as to the existence . . . of [medical] illnesses." *Id.* at 649 & n.1 (citation omitted). The court recognized that the plaintiff was "competent to testify about the effects of the alleged condition," but held that the "cause of such a condition is a medical question . . . not within the certain knowledge of laymen" and "must be proved by expert testimony." *Id.* at 649; *see also Santiago v. New York City Police Dep't*, No. 05CIV3035(PAC)(MHD), 2007 WL 4382752, at *7 (S.D.N.Y. Dec. 14, 2007) ("Santiago's self-diagnosis that he was depressed or upset or stressed out does not constitute an impairment. There is no competent, medical diagnosis of depression; and so there can be no impairment."), *aff'd*, 329 F. App'x 328 (2d Cir. 2009); *Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 232 (W.D.N.Y. 1997) (the plaintiff alleged a "mental impairment" that he described as "mental stress," "depression," "manic-depression," and

"psychosis," but failed to offer any "expert opinion, medical affidavit, hospital or treating doctor's record indicating any medical diagnosis" or evidence that the plaintiff suffered from a specific "mental impairment" at the time of the alleged discriminatory action); *see also Felkins*, 774 F.3d at 651 (holding that the plaintiff needed medical evidence to establish "impairment" based on a diagnosis of "avascular necrosis"; the plaintiff's own declarations stating that she had avascular necrosis were not sufficient proof); *Astorga v. Idahoan Foods, LLC*, No. 1:18-cv-000195-DCN, 2019 WL 4120803, at *6 (D. Idaho Aug. 29, 2019) (holding that the plaintiff's self-diagnosis of arthritis "cannot serve as the basis for an ADA claim").[9]

---

[9] The court notes that the facts of this case are distinguishable from those of *Chaniott v. DCI Donor Servs., Inc.*, 481 F. Supp. 3d 712 (M.D. Tenn. 2020), in which the undersigned denied a motion for summary judgment, rejecting the defendant's argument that the plaintiff could not establish that he suffered a mental impairment based on anxiety and depression when there was "no evidence in the record to support an actual DSM-IV diagnosis of either anxiety or depression." *Id.* at 722 (referring to the Diagnostic and Statistical Manual of Mental Disorders–Fourth Edition).

In that case, unlike this one, it was undisputed that the plaintiff was under the care of a psychologist and had been suffering from symptoms related to anxiety and depression for years. *Id.* at 717. In addition, the plaintiff produced a note from his doctor stating that he was receiving "ongoing treatment for depressed and anxious mood," that he had "encountered debilitating sleep disturbance and mood deterioration when fulfilling a night shift schedule in the past," and that it could be "expected that such a shift would exacerbate mood and sleep difficulties if accommodation for alternative work shifts cannot be implemented." *Id.* at 719. The court found that this evidence, coupled with the plaintiff's description of his symptoms, was sufficient to establish the existence of an impairment based on depression and anxiety, regardless of whether the plaintiff's physician was willing to testify that the plaintiff's symptoms tracked those of the DSM. The court noted that the primary basis for the plaintiff's treating physician's conclusion that the plaintiff did not qualify for a DSM diagnosis was that "his claimed acute anxiety after his reassignment to night shift was not representative of his usual mental health." *Id.* at 722. Under the ADA, however, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C.A. § 12102(4)(D). In addition, the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting" for purposes of proving an actual disability. 29 C.F.R. § 1630.2(j)(1)(ix). The court concluded that the defendant could not rely on the fact that the plaintiff's symptoms of anxiety "were usually not disabling or had not been disabling before, because "[e]pisodic, acute exacerbations of a symptom, if they interfere in a substantial life activity, can be enough to warrant consideration of an accommodation under the ADA." *Chaniott*, 481 F. Supp. 3d at 722.

In this case, the plaintiff never informed any of her supervisors at the Agency that she had been diagnosed by a medical professional as suffering from any mental or emotional illness, and her self-diagnosis of depression and anxiety is not sufficient, under the circumstances presented here, to establish that she suffered from these conditions. Moreover, although she indicated that she was planning to get counseling from the EAP, there is no indication in the record that she actually did so, that she obtained a diagnosis in that context, or that Dr. Ahmad ever diagnosed her as suffering from any mental disorder.[10]

Certainly, the general populace throws around the term "depression" colloquially to mean sad or down and the term "anxiety" to mean stress. Just because someone calls herself anxious and depressed, however, does not mean that she suffers from a "mental or psychological disorder." 29 C.F.R. § 1630.2(h)(2). In sum, the court finds, as a matter of law, that depression and anxiety, in order to qualify as an impairment under the ADA, must actually have been diagnosed by a medical professional, even if the condition does not actually meet all of the criteria for a disorder as defined by the DSM. The court does not find it necessary to reach the question of whether the plaintiff would have been required to present actual medical documentation of her mental health condition in order to defeat summary judgment. In this case, the plaintiff has not offered evidence, even in the form of hearsay in her Declaration or otherwise, that she ever received a diagnosis of depression or anxiety.

Because the plaintiff has failed to establish that she suffered from a mental, or any other, impairment, as required to establish that she was disabled, the defendant is entitled to summary

---

[10] The fact that Dr. Ahmad apparently prescribed Zoloft does not change this analysis, particularly given that there is no competent evidence in the record regarding the medical condition for which Zoloft was prescribed or its expected effect, other than that it should make the plaintiff "improve a great deal" in a "few weeks." (Doc. No. 34-7.)

judgment in his favor on the plaintiff's claim for failure to accommodate. As set forth below, however, the court also find that the plaintiff cannot meet other elements of her *prima facie* case or show that the defendant's proffered reason for its action is pretextual.

b)      *Failure to Request an Accommodation*

Because the plaintiff has not shown that she was disabled, the defendant incurred no obligation under the Rehabilitation Act to provide an accommodation for a disability. Regardless, the plaintiff cannot show that she was denied a reasonable accommodation or that the defendant failed to engage in the interactive process in good faith.

The Rehabilitation Act, like the ADA, recognizes that "[m]any disabled individuals require accommodations to perform their jobs" and "addresses this reality by requiring [employers] to make "reasonable accommodations to the known . . . limitations of an otherwise qualified individual with a disability," where such an accommodation does not cause the employer "undue hardship." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (quoting 42 U.S.C. § 12112(b)(5)). An employee "is not required to use magic words such as 'accommodation' and 'disability'" when requesting an accommodation. *Fisher*, 951 F.3d at 419. Rather, the Sixth Circuit has instructed the district courts to "ask whether 'a factfinder could infer that [the interaction] constituted a request for an accommodation.'" *Id.* (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). *See also White v. Honda of Am. Mfg., Inc.*, 191 F. Supp. 2d 933, 950 (S.D. Ohio 2002) ("The ADA does not require that any talismanic language be used in a request for reasonable accommodation.") (citations omitted)." At the same time, however, "[i]f a disabled employee does not propose an accommodation, the 'failure to accommodate' claim must fail." *Backhaus v. Gen. Motors LLC*, 54 F. Supp. 3d 741, 752 (E.D. Mich. 2014) (citing *Kocsis v. Multi–Care Mgmt.*, 97 F.3d 876, 883 (6th Cir. 1996)).

In this case, notably, the plaintiff never requested that she be allowed to work at a reduced productivity level for any period of time, nor has she established that an accommodation of that type would have been reasonable, as it is undisputed that meeting productivity requirements was a "critical" element of her job. (*See, e.g.*, PIP, Doc. No. 34-1, at 45.) Instead, in response to the Motion for Summary Judgment, the only evidence of a request for an "accommodation" to which the plaintiff points is her October 6 email, in which she vaguely requested that she be "allow[ed] . . . to pursue all resources" available to her in order to recover from the loss of her parents, presumably referring to the EAP, and that she be granted "time to work through this crisis phase." (Doc. No. 41-2, at 3.)

The evidence indicates, however, that her supervisors had repeatedly reminded her that the EAP was available to her, though there is no evidence in the record as to whether the plaintiff actually availed herself of that opportunity. Moreover, the record is clear that the plaintiff was allowed all the leave time she requested, apparently including the first two weeks of September and additional time in October 2014.[11] Importantly, the plaintiff never requested, during the meeting with Becker or when she was presented with the LCA, that she be granted FMLA leave or some other form of leave in order to "continue [her] improvement while under medical treatment." (Jones Decl., Doc. No. 41 ¶ 22.) To the extent the plaintiff had previously sought counseling through the EAP and extra leave time as an accommodation, those requests were repeatedly granted, and there is no reason to presume that a request for additional leave would not have been granted.

---

[11] The plaintiff's productivity reports for the first two weeks of September indicate that she worked 7.5 hours during that time frame. (*See* Doc. No. 34-1, at 40–41.) The productivity report provided to the plaintiff by Hatfield for the week of October 13, 2014, for example, indicates that the number of work hours used to calculate the plaintiff's productivity score for that week was 22.5, suggesting that she took additional leave time that week. (*See* Doc. No. 41-4, at 1.)

Similarly, the letter *from her attorney* to Becker makes no express reference to a request for an accommodation. Rather, it indicates that the plaintiff's issues with productivity are all in the past and that she has remedied her work performance issues by seeking medical care and then raising her productivity scores to acceptable levels during October 2014. (*See* Doc. No. 34-1, at 30 ("[S]he has taken proactive measures to bring herself back to a successful level by seeking medical help, which has shown to be of great help and effect.").) That is, her counsel appears to be asking for the Agency's forgiveness of the plaintiff's *past* failure to perform at an acceptable level and requesting that the plaintiff be granted the opportunity to prove that she could perform acceptably going forward, but without additional accommodations, such as leave time.

Likewise, it is at least arguable that the plaintiff requested an accommodation, both during her meeting with Becker and in her October 6 email, in the form of being granted an opportunity to prove that she could perform acceptably going forward. Her email requested "time" to work through her crisis (Doc. No. 41-2, at 3), and she unambiguously communicated to Becker her eagerness to continue working for the Agency. *See Fisher*, 951 F.3d at 419 (noting that "a request as generic as 'I want to keep working for you—do you have any suggestions?'" could qualify as a request for an accommodation). In this lawsuit, she asserts that, instead of being allowed to continue to work while pursuing counseling and medical treatment, she was given notice that her termination was being considered and was not given "any opportunity to demonstrate acceptable work performance while under medical care." (*See, e.g.*, Doc. No. 40 ¶ 66.) That is not true, however. The Agency responded to her request by offering her the LCA, which would have given the plaintiff the opportunity to show that she could meet productivity standards going forward. The plaintiff, rather than counter-offering or even responding to the proposal, simply notified Hatfield on December 19, 2014 (a week after her receipt of the LCA) that she was instead retiring, effective

December 31, 2014. (Doc. No. 34-1, at 67.) In light of the plaintiff's failure to request any other form of accommodation (such as additional leave time) or otherwise respond to the proposed LCA, the defendant cannot be charged with failing to accommodate the plaintiff or, alternatively, failing to engage in the interactive process.

The plaintiff appears to argue that the LCA was unreasonable, but she offers no evidence that it was different from similar proposals offered to other employees in her same situation. In addition, the record is clear that the plaintiff had been having difficulty maintaining productivity standards since at least 2013. She successfully maintained an acceptable level of productivity for the ninety days during which she was under the PIP and working closely with Nave, but then she immediately experienced a drop in productivity as soon as the PIP ended, at which point her employment could have been terminated. Her productivity levels improved for the first few weeks of October, but, given her history, that period of improvement was not necessarily an indicator that she could sustain it.

It is not at all clear that an accommodation in the form of additional time to show that she could meet productivity requirements would actually qualify as an accommodation of a disability. Even assuming that it is, the court finds that the plaintiff was not denied an accommodation, and the defendant did not fail to engage in good faith in the interactive process.

### 3.    Pretext

The plaintiff cannot establish a *prima facie* case of failure to accommodate a disability. Even if she could, the defendant has articulated a legitimate, non-discriminatory reason for its actions: that the Proposal Removal notice and LCA) were "fully justified by Plaintiff's repeated failure to maintain a successful productivity score." (Doc. No. 34, at 19.) Under *McDonnell Douglas*, the burden thus shifts back to the plaintiff to demonstrate that the Agency's non-discriminatory reason was pretextual. *Lisan v. Wilkie*, 835 F. App'x 831, 836 (6th Cir. 2020)

(citations omitted). She can do so by showing that the Agency's proffered reason "(1) has no basis in fact; (2) was not its actual motivation; or (3) was insufficient to explain or motivate its action." *Id.* (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013)).

The plaintiff does not argue that the proffered reason has no basis in fact. Instead, she contends that there is "a conflict about what statistics were used" against her. (Doc. No. 39, at 15.) In support of this assertion, she claims that DeGrasse testified that the plaintiff's "statistics during the time Plaintiff lost her parents and time Plaintiff had off to 'deal with her concerns and emotions' would not have been used against her" but that this statement is "belied by the fact that Plaintiff's June–September statistics are specifically referenced in the notice of proposed removal." (Doc. No. 39, at 15 (quoting DeGrasse Dep., Doc. No. 42-3, at 13–14).) She also claims that there is no evidence that the statistics were adjusted in recognition of her parents' deaths, as DeGrasse suggested. (*Id.*)

In fact, DeGrasse testified that the time the plaintiff had taken off was not used against her, and, as discussed above, the record supports that assertion. While DeGrasse's suggestion that there was some additional adjustment of the plaintiff's productivity scores for the month of September is not substantiated by the record, the plaintiff has not shown that her overall statistics for September were markedly lower than, or different from, her statistics for the preceding four months (*see, e.g.*, Doc. No. 34-4, at 62 (Oct. 1, 2014 email from Hatfield to Jones noting productivity performance average of 75% for May through September)), or indeed, from her statistics for the last three months of 2013 (*see* Doc. No. 34-4, at 33 (Dec. 18, 2013 email from Nave to Jones, noting productivity average of 67% for October through December 2013), just before she was placed on the PIP. Further, the plaintiff does not take issue as a factual matter with

the calculation of her statistics. Nor does she contend that she was subject to a more stringent standard than other employees, that any of her colleagues were having similar difficulties meeting the performance standard, or that her repeated difficulty in sustaining an acceptable productivity level was insufficient to motivate the notice of Proposal Removal.

Along the same lines, the plaintiff posits that pretext is suggested by DeGrasse's testimony that it would not be fair to use productivity numbers against the plaintiff when she was not being provided her statistics or "having regular discussions about her performance." (Doc. No. 39, at 15 (quoting DeGrasse Dep. 25, 36–37.) However, the cited testimony indicates that DeGrasse believed, at the time she was deposed, that the plaintiff's poor performance numbers occurred, at least in part, while she was still on the PIP. (*See* DeGrasse Dep. 25 ("If she was on a PIP they would be having regular . . . discussions between her and her supervisor [about productivity].").) Further, regardless of whether the plaintiff ideally should have been receiving more oversight and supervision than she was getting during the summer of 2014, the fact remains that, even while she was still being supervised by Nave and receiving reports from him from April through June 2014, following the termination of the PIP, she was aware that her numbers were unacceptable at that time. There is no suggestion that she reasonably believed they had improved during the summer of 2014, when she was receiving less supervision than normal due to the transition in the leadership of her division. In any event, DeGrasse's statement about what she believes would have been "fair" does not suggest that the Agency's proffered reason for its personnel decisions regarding the plaintiff was not based in fact, did not actually motivate the decisions, or was insufficient to motivate its decisions. DeGrasse's testimony does not suggest pretext.

Finally, the plaintiff argues that the "extremely close temporal proximity (approximately three weeks)" between Jones's request for an accommodation and the issuance of the Proposed

Removal notice supports a finding of pretext. (Doc. No. 39, at 15.) "But temporal proximity, standing alone, is not sufficient evidence of pretext." *Thompson v. Ameritech Advert. Servs.*, 40 F. App'x 90, 93 (6th Cir. 2002) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)); *see also Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) ("Unlike its role in establishing a *prima facie* case, the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." (internal quotation marks and citation omitted)).

In sum, none of the plaintiff's arguments suggests that the Agency's reason for its action was pretextual. For this reason as well, the defendant is entitled to summary judgment on the plaintiff's claim of disability discrimination based on an alleged failure to accommodate.

### B. Retaliation

The Rehabilitation Act incorporates the ADA's prohibition against retaliation. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 696 (6th Cir. 2013). Under both: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter," 42 U.S.C. § 12203; *see also* 29 C.F.R. § 33.13 ("No person may discharge, intimidate, retaliate, threaten, coerce or otherwise discriminate against any person because such person has filed a complaint, furnished information, assisted or participated in any manner in an investigation, review, hearing or any other activity related to the administration of, or exercise of authority under, or privilege secured by section 504 [29 U.S.C. § 794] and the regulations in this part.").

The plaintiff does not present any direct evidence of retaliation, so her retaliation claim, too, is analyzed under the *McDonnell Douglas* burden-shifting approach. *A.C. ex rel. J.C.*, 711 F.3d at 697 (citing *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). The plaintiff must first

state a *prima facie* case of retaliation. If she can establish a *prima facie* case of retaliation, the burden shifts to the Agency to show that it had a legitimate, non-retaliatory basis for its actions. *DiCarlo*, 358 F.3d at 414. And if it can do so, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by [the Agency] were not its true reasons, but were a pretext for" retaliation. *Id.* at 414–15.

The defendant asserts that the plaintiff cannot establish a *prima facie* case of retaliation and, even if she could, she cannot show that the Agency's reasons for its actions were pretextual. The court finds, for the reasons set forth above, that, even assuming the plaintiff can establish a *prima facie* case of retaliation, she cannot establish that the defendant's articulated reason for its actions is pretextual. The defendant, therefore, is entitled to summary judgment on the retaliation claim as well.

### C.     Constructive Discharge

Independent of her failure to accommodate and retaliation claims, the plaintiff asserts that the Agency violated the Rehabilitation Act by constructively discharging her. "A constructive discharge occurs when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign,'" *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020) (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008),[12] and the employee actually resigned, *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016).

---

[12] The Sixth Circuit has also held that, to succeed on a constructive discharge claim, "an employee must also show that the employer intended to oust him." *Tchankpa*, 951 F.3d at 814 (citing *Talley*, 542 F.3d at 1107). In *Tchankpa*, the Sixth Circuit noted the possibility that the "Supreme Court eliminated the subjective intent prong for ADA constructive discharge." *Id.* at 815 (citing *Green v. Brennan*, 136 S. Ct. 1769, 1779–80 (2016)). The court did not reach the question, however, because the plaintiff had waived it by raising this argument for the first time on appeal and, "worse, he argued the opposite" in the district court proceedings." *Id.* at 814.

Although the parties here address it as such, the plaintiff's constructive discharge claim is not a stand-alone claim. Instead, constructive discharge is an element of the plaintiff's *prima facie* case of disability discrimination or retaliation: that she suffered an adverse action. *See, e.g.*, *Talley*, 542 F.3d at 1105 (noting that the central issue in that case was "whether the defendants 'alleged refusal to provide [the plaintiff] with a reasonable accommodation converted her resignation into a constructive discharge'"); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 555 (6th Cir. 2008) ("Nance contends that she was 'constructively discharged' and thus subject to an adverse employment action when Goodyear forced her to work without a safety gate and under poor lighting."); *Torok v. Gibralter Veterinary Hosp., Inc.*, 442 F. Supp. 2d 438, 450 (E.D. Mich. 2006) ("Defendant's motion challenges the 'adverse action' prong . . . of Plaintiff's *prima facie* case under . . . the ADA. In particular, Defendant contests the principal "adverse action" claimed by Plaintiff in her complaint—namely, that she was constructively discharged.").

Because the plaintiff has failed to establish the she suffered discrimination or retaliation, the court has no need to address the question of whether the plaintiff's voluntary retirement was actually a constructive discharge.

## IV.  CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge